Alvin A. OWENS, Jr.

v.

Charles P. SILVIA, M.D., et al.

No. 2002–218–Appeal.

Supreme Court of Rhode Island.

Dec. 22, 2003.

7. The fact that 1992 was a leap year is reflected in this calculation.

David Oliveira, for Plaintiff.

Michael G. Sarli, William H. Jestings, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

**OPINION**

FLANDERS, Justice.

In this medical-malpractice case, the trial justice excluded proffered expert-witness testimony about the asserted liability of various medical professionals and a hospital to a patient who suffered permanent injuries while undergoing a prolonged operation. The trial justice barred the testimony of Dr. Mark D. Johnson (Dr. Johnson), the sole expert witness on liability for the plaintiff, surgical patient Alvin A. Owens, Jr. (plaintiff or Owens). Doctor Johnson was prepared to opine at the trial about the applicable standard of care, the alleged breach of that standard, and what caused plaintiff to suffer permanent injuries to his left arm and sciatic nerve during the unexpectedly prolonged surgery to reconstruct his jaw. After so ruling, the court entered judgment as a matter of law in favor of the defendants, anesthesiologist Gregory Towne, M.D. (Dr. Towne), nurse anesthetist Rebecca Paolino, C.R.N.A. (Nurse Paolino), and Rhode Island Hospital (hospital) (collectively referred to as defendants).[1] The plaintiff appeals from the judgment in favor of the defendants.

Concluding that the trial justice abused his discretion and misapplied the applicable law governing the admission of expert testimony, we reverse and remand for a new trial. On the other hand, we affirm the court's rulings preventing plaintiff from using the depositions of defendants' expert witnesses during plaintiff's case-in-chief and refusing to hold a hearing in limine before deciding whether to allow

1. The plaintiff settled his claim against the defendant surgeon, Charles P. Silvia, M.D., before trial. Therefore, Dr. Silvia was not a party when the case was tried and he is not a party to this appeal.

defendants to introduce evidence that plaintiff assumed the risk of certain injuries when he agreed to the surgery in question.

## Facts and Travel

Alleging that the negligence of the operating-room team (OR team) during his extended eleven hours of jaw-reconstruction surgery caused him to suffer serious permanent injuries to his left arm and sciatic nerve, plaintiff sued defendants for medical malpractice. He asserted that, while he was immobilized for approximately twelve hours during what was supposed to be a two-to-four-hour operation, blood flow to the left side of his body was radically diminished for an extended period, causing him to suffer permanent injuries to his left forearm and to his left sciatic nerve, as well as leaving him with lesions on his left buttocks, heels, and forehead.

Before trial, the Superior Court convened a preliminary hearing, pursuant to Rule 104(a) of the Rhode Island Rules of Evidence, to consider the admissibility of the proffered testimony of plaintiff's expert witness on liability. At this hearing, Dr. Johnson, a board-certified anesthesiologist and plaintiff's sole expert witness on defendants' asserted liability, testified outside the presence of the jury to his medical opinions concerning the applicable standard of care in anesthesiology during plaintiff's surgery, defendants' alleged breach thereof, and how this alleged breach caused the injuries in question.

At the conclusion of the hearing, the trial justice denied defendants' motion to exclude the testimony of Dr. Johnson from admission into evidence during the trial, ruling that he would be permitted to testify before the jury.[2]

In deciding that Dr. Johnson would be permitted to testify to his opinions, the trial justice stated that "[t]he jury will be—should be capable of determining whether or not the testimony introduced by Dr. Johnson is worthy of belief and

2. In so ruling, the trial justice explained his reasoning as follows:

"The proffered testimony of Dr. Johnson in this particular matter based upon his testimony, the precise opinion that Dr. Johnson offers, [shows] that during a long procedure that there was focal pressure to Mr. Owens'[s] left forearm caused by some object, whether it was the sled, whether it was the blanket, whether it was the gel pack, whether it was the sheet that was wrapped around Mr. Owens before the operation, something caused focal pressure which led to a restriction of blood, blood flowing to the region of Mr. Owens'[s] forearm, which caused the compartment syndrome.

"Dr. Johnson's testimony is that although it has not been tested, and the reason * * * that it has not been tested, at least in human beings, is because medical ethics do not permit such tests. That Dr. Johnson was taught by his professors, and that he in turn teaches his students that you have to rely on basic principles of physiology and clinical practice to determine when—if first and when a patient should be checked during the course of an extended surgery to determine whether there's any concerns to pressure related injuries.

"Dr. Johnson acknowledged that the only test that he was aware of was the test performed on dogs using the total tourniquet process. However, Dr. Johnson, in re-direct examination at least, there is an Offer of Proof that was made by Mr. Oliveira that had he been permitted to do so and testify, he would have testified that it is acknowledged in the medical community that tests that were done on dogs are considered by physicians in determining the effect on muscles in humans based upon a loss or reduction of blood. Dr. Johnson acknowledged that he was unaware of any known or potential rate of error for the study that he testified he was aware of.

"There has been no evidence offered as to whether or not the theory of Dr. Johnson is an accepted theory by others and whether it has gained any general acceptance in the relevant scientific field."

what weight, if any, they choose to give to the testimony."

Eventually, after several false starts, the trial began some ten months later, and plaintiff presented numerous witnesses. But before he could call Dr. Johnson as an expert witness, Dr. Towne and Nurse Paolino moved the court to reconsider its previous decision allowing Dr. Johnson to testify. They argued, as they had previously, that his testimony was not scientifically sound and, therefore, it should not be admitted into evidence. They contended that, between the preliminary hearing and the trial, the individuals who were present in the operating room during the surgery had testified at the trial and no evidence suggested that plaintiff's unconscious body had received any direct trauma, internal injury, or pressure during the surgery that could have caused his injuries.

At the conclusion of the hearing on defendants' renewed motion to preclude the expert testimony of Dr. Johnson, the trial justice reversed his previous ruling, granted the motion, and barred Dr. Johnson from communicating his opinions to the jury. The trial justice reexamined the doctor's testimony from the preliminary hearing, stating that he was required now to view this proffered evidence "in the context in which it is about to be introduced." In doing so, he found that all the individual defendants had testified during the trial that they observed no evidence during the surgery to suggest the existence of any external pressure points on plaintiff's body that could have impeded the blood flow to the patient's injured arm and nerve areas. The trial justice reexamined Dr. Johnson's testimony in light of the leading cases in this jurisdiction concerning the admissibility of expert testimony, concluding that, in this situation, no scientific studies or any published anesthesia standards or protocols corroborated Dr. Johnson's proffered opinions. Thus, according to the trial justice, the witness was attempting to promulgate what amounted to a novel theory of liability. The trial justice concluded that, in such instances, "the Court must determine the reliability or evaluate the reliability of the opinion, [and] the methodology that is employed by the proposed expert in reaching that particular opinion." In doing so, the trial justice found that the opinions of Dr. Johnson were not scientifically reliable and he therefore precluded him from testifying.

Thereafter, defendants moved for judgment as a matter of law because plaintiff represented to the court that, without Dr. Johnson's testimony, he had no other expert evidence to prove that defendants breached the applicable standard of care and thereby caused his injuries. The court then granted defendants' motion for judgment as a matter of law and entered judgment in favor of defendants. In his appeal, plaintiff raises several issues that we address below.

## I

### The Propriety of Reconsidering the Admissibility of Dr. Johnson's Testimony in the Context of the Trial

First, plaintiff argues that the trial justice erroneously reconsidered his pretrial ruling admitting the expert testimony of Dr. Johnson. As a board-certified anesthesiologist, Dr. Johnson was prepared to testify that defendants' negligence caused plaintiff's injuries. The plaintiff contends that Dr. Johnson's testimony was both proper and probative on the issue of liability. He maintains that the trial justice committed a clear error of law in reversing his initial finding after the preliminary hearing, when he ruled that Dr. Johnson could testify as an expert. The plaintiff suggests that the trial justice, in later

changing his mind and in excluding this testimony, "relied solely on the fact that plaintiff had offered no evidence up to that point in the trial which corroborated Dr. Johnson's testimony." He argues that, in excluding the opinion of Dr. Johnson, the trial justice misinterpreted this Court's holding in *State v. Cook*, 782 A.2d 653 (R.I.2001) (per curiam), in which we acknowledged that trial justices can revisit their rulings on motions *in limine*. He asserts that *Cook* "only requires that the trial court determine whether any evidence had been admitted during the interim period which would call into question the propriety of the original ruling on the preliminary matter."

The defendants maintain that the trial justice properly excluded the proffered testimony of Dr. Johnson. The hospital argues that it was appropriate for the trial justice to revisit his earlier decision about the admissibility of the proffered opinions of plaintiff's expert witness—especially in light of the fact that, at trial, there was no scientific or factual support for Dr. Johnson's proposed expert testimony. Doctor Towne and Nurse Paolino also contend that the trial justice reconsidered his previous ruling in the context of the evidence adduced at the trial as of the time the expert witness was proffered. They maintain that the trial justice properly excluded the testimony of Dr. Johnson because there was no scientific or factual basis to support his opinions about the applicable standard of care, defendants' alleged breach thereof, and the cause of plaintiff's injuries.

█ "A motion *in limine* is 'widely recognized as a salutary device to avoid the impact of unfairly prejudicial evidence upon the jury and to save a significant amount of time at the trial.'" *BHG, Inc. v. F.A.F., Inc.*, 784 A.2d 884, 886 (R.I. 2001). We review a trial justice's decision on a motion *in limine* for an abuse of discretion. *See Graff v. Motta*, 748 A.2d 249, 253–54 (R.I.2000). "This Court will not disturb a trial justice's ruling on the admissibility of expert testimony absent an abuse of discretion." *ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 314 (R.I.2001).

In *Cook*, we explained that a trial justice can reconsider a previous ruling on a motion *in limine* during a trial or any rebuttal case:

"'[T]he granting of a motion *in limine* need not be taken as a final determination of the admissibility of the evidence.' * * * The trial justice can reconsider the motion in limine during the trial or in rebuttal. This is because 'the purpose of the motion *in limine* is to "prevent the proponent of potentially prejudicial matter from displaying it to the jury * * * in any manner until the trial court has ruled upon its admissibility in the context of the trial itself.' " * * * Finally, 'by adopting this approach, we do not suggest that a determination made upon a motion *in limine* should be ignored by the parties but only that the trial justice may, *in appropriate circumstances*, reconsider such a determination without committing error per se.'" *Cook*, 782 A.2d at 654–55. (Emphasis added.)

█ Given this Court's holding in *Cook*, the trial justice, we hold, did not commit error per se in reconsidering the motion during trial. When doing so, the trial justice stated:

"We are again at the point in time where Dr. Johnson's testimony is * * * being sought to be admitted by the plaintiff * * *. The court * * * is to view * * * the proffered testimony in the context in which it is about to be introduced. And in the context of this matter * * * we have the testimony of

Dr. Towne, Ms. Paolino, Ms. Choinere, Ms. Rocha, who were all present in the operating room * * *. All of those witnesses have testified * * * as to the presence of any indication suggesting pressure points for Mr. Owens * * *. There were none."

After hearing the live testimony of five witnesses and assessing their credibility, the trial justice determined that Dr. Johnson's testimony was unreliable and, therefore, inadmissible. In accordance with *Cook*, the trial justice did not err in concluding that he was entitled to revisit his earlier determination in the context of the trial and, in appropriate circumstances, if the evidence then before him so warranted, to reverse his previous ruling. In so doing, the trial justice is required to set forth with particularity the circumstances giving rise to a reversal of this pretrial ruling. Here, however, for the reasons set forth below, we hold that the circumstances were not appropriate to warrant reversing his previous ruling admitting Dr. Johnson's testimony and, therefore, the trial justice abused his discretion in doing so.

## II

### Excluding the Expert's Proffered Testimony

■■■ A trial justice's ruling on the admissibility of an expert witness's proffered testimony "will be sustained provided the discretion has been soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action, * * * and not arbitrarily or willfully, but with just regard to what is right and equitable under the circumstances and the law." *Morra v. Harrop*, 791 A.2d 472, 476–77 (R.I.2002) (quoting *DeBartolo v. DiBattista*, 117 R.I. 349, 353, 367 A.2d 701, 703 (1976)). "The

purpose of expert testimony is to aid in the search for the truth. It need not be conclusive and has no special status in the evidentiary framework of a trial." *Morra*, 791 A.2d at 477. "[A] jury is free to accept or to reject expert testimony in whole or in part or to accord it what probative value the jury deems appropriate." *Id.*

Rule 702 of the Rhode Island Rules of Evidence addresses the testimony of experts and states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." In addition, G.L.1956 § 9–19–41—entitled "Expert witnesses in malpractice cases"—provides:

"In any legal action * * * for personal injury or wrongful death filed against a licensed physician [or] hospital * * * based on professional negligence, only those persons who by knowledge, skill, experience, training, or education qualify as experts in the field of the alleged malpractice shall be permitted to give expert testimony as to the alleged malpractice."

In *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677, 686 (R.I.1999), this Court discussed the standard for admitting expert scientific testimony that should govern the trial court's decision about whether to allow the jury to hear this type of evidence. Although we declined to expressly adopt the standards outlined in the United States Supreme Court decision of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), we drew guidance from the principles of that case. *DiPetrillo*, 729 A.2d at 686.

▋▋▋ When a party seeks to introduce, through expert testimony, novel scientific or complex technical evidence, it is proper for the trial justice to exercise a gatekeeping function. *Id.* at 685. This is because novel scientific or complex technical evidence can be difficult to understand and evaluate and, therefore, it runs the risk of being " 'both powerful and quite misleading.' " *Id.* at 688. Because expert witnesses are permitted to testify by giving their opinions—despite their frequent lack of any first-hand knowledge or observations of the factual circumstances at issue—their testimony lacks the conventional personal knowledge that is generally required of lay witnesses. *Daubert,* 509 U.S. at 592. The primary function of the trial justice's gate-keeping role is to assure that the proposed expert testimony, presented as a scientifically valid theory, is not mere "junk science." *See Gallucci v. Humbyrd,* 709 A.2d 1059, 1064 (R.I.1998). As a result, the trial justice must ensure that the parties present to the trier of fact only expert testimony that is based on ostensibly reliable scientific reasoning and methodology. *DiPetrillo,* 729 A.2d at 690; *see Daubert,* 509 U.S. at 592–93.

▋▋▋ If a party seeks to introduce novel or highly complex scientific or technical expert testimony, the trial justice must "control the gateway * * * by conducting pursuant to Rule 104 an early, preliminary assessment of the evidence." *DiPetrillo,* 729 A.2d at 686. In such a case, the trial justice may admit the expert testimony only if the expert proposes to testify "to (1) scientific knowledge that (2) will assist the trier of fact." *Id.* at 687. Helpfulness to the trier of fact is the most critical consideration for the trial justice in determining whether to admit proposed expert testimony. *State v. Wheeler,* 496 A.2d 1382, 1388 (R.I.1985). The first part of the inquiry, often referred to as the "reliability" test, is the focus of the parties' dispute here.[3]

▋▋▋ Four non-exclusive factors can be helpful in determining if expert testimony about novel or technically complex theories or procedures possesses scientific validity. They are: (1) whether the proffered knowledge has been or can be tested; (2) whether the theory or technique has been the subject of peer review and publication; (3) whether there is a known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the scientific community. *DiPetrillo,* 729 A.2d at 689 (citing *Dau-*

---

3. The latter part of the inquiry "requires the trial court to evaluate the relevance of the proffered testimony in assisting the trier of fact to understand the evidence or to determine a fact in evidence." *DiPetrillo v. Dow Chemical Co.,* 729 A.2d 677, 689 (R.I.1999). The expert's testimony must be " 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Id.* If the testimony " 'logically advances a material aspect of the proposing party's case,' " *id.,* the court may deem it relevant and admissible.

Here, a factual dispute existed about the cause of Owens's injuries and when those injuries occurred. Doctor Johnson was prepared to opine that focal pressure during surgery caused Owens's injuries. The defendants, however, presented evidence that a hematoma, resulting from the bone-graft procedure on Owens's hip, caused Owens's sciatic nerve and buttock injury. Additionally, they presented evidence suggesting that internal pressure on the patient's arm caused the compartment syndrome, rather than external pressure. Dr. Towne testified that, based on his review of the anesthesia records, he believed Owens's compartment-syndrome injury occurred during the surgery. The defendants, however, when questioning Dr. Johnson in the preliminary hearing, suggested that the injury could have taken place in the post-operative recovery unit after the surgery. This conflicting evidence created factual issues that were appropriate for submission to the jury.

*bert,* 509 U.S. at 593–94, 113 S.Ct. 2786). Satisfaction of one or more of these factors may be sufficient to admit the evidence and each factor need not be given equal weight in the analysis. *DiPetrillo,* 729 A.2d at 689. The court may also consider the qualifications of the expert in determining whether the underlying methods are reliable. *Id.* But, importantly, especially when the proffered knowledge is neither novel nor highly technical, satisfaction of one or more of these factors is not a necessary condition precedent to allowing the expert to testify. *See id.*

Trial justices are not required to become scientific experts to apply these factors. *DiPetrillo,* 729 A.2d at 689. And courts should not exclude highly technical or novel scientific expert testimony simply because they disagree with the conclusions of the expert. *See id.* at 690 (citing *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1230 (9th Cir.1998)). The proponent of the evidence need only show that the expert arrived at his or her conclusion in what appears to be a scientifically sound and methodologically reliable manner. *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Once proffered expert evidence is determined to possess apparent reliability, the trial justice should submit the expert's testimony to the trier of fact to determine how much weight to accord such evidence. *DiPetrillo,* 729 A.2d at 690.

## A. The Trial Justice Misapplied *DiPetrillo* Because Dr. Johnson's Testimony Was Not Based on a Novel or Technically Complex Theory of Medicine

In determining whether the information upon which the expert proposes to testify is truly scientific knowledge pursuant to Rule 702, the trial justice must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and * * * whether the reasoning or methodology properly can be applied to the facts in issue." *DiPetrillo,* 729 A.2d at 687 (quoting *Daubert,* 509 U.S. at 592–93). Many courts have interpreted *Daubert* to liberalize the admission of expert testimony by providing a mechanism by which parties can admit new or novel scientific theories into evidence that may have previously been deemed inadmissible. David L. Faigman et al., *Modern Scientific Evidence,* § 1–3.4 at 26 n. 74 (2002) (collecting cases). "[T]he *Daubert* analysis does not establish a heightened threshold for the admission of expert evidence, but rather focuses on the court's 'gatekeeper' role as a check on 'subjective belief' and 'unsupported speculation.'" *Ambrosini v. Labarraque,* 101 F.3d 129, 134 (D.C.Cir. 1996). But when the scientific foundation for an expert's theory is so common and well understood that the proponent of the testimony can lay the foundation while qualifying the witness as an expert, the court may take judicial notice of the reliability of the knowledge or theory that undergirds the expert's proposed testimony. *DiPetrillo,* 729 A.2d at 688. In such a case, a preliminary hearing may not even be necessary to establish the admissibility of the evidence. *Id.*

In this case, Dr. Johnson proposed to testify concerning the damage caused by inadequate blood flow to parts of an unconscious patient's body during a prolonged surgery and how external pressure applied to the patient's body can diminish blood flow to affected areas of the body causing injuries, such as a "compartment syndrome." A medical dictionary defines "compartment syndrome" as the ele-

vation of tissue pressure within a closed fascial compartment—that is, a part of the body sheathed with a covering of connective tissue, such as muscle areas of the arm. *See Taber's Cyclopedic Medical Dictionary* 463 (Donald Venes & Clayton L. Thomas eds., 19th ed.2001). One cause of this syndrome is external compression. *Id.* Compartment syndrome may lead to necrosis, which is the death of muscle tissue from a reduction in blood flow to the affected area. *See id.* Here, during his testimony at the preliminary hearing, Dr. Johnson based his causation theory on fundamental principles of physiology. Thus, he testified how "focal pressure" during an operation—caused by body contact with external devices—could reduce the blood supply to parts of the unconscious patient's body, eventually causing injury:

"[A]ll tissues, skin, [and] muscle require blood supply. If you have something placing * * * a direct point of pressure or focal pressure on an area of the body, on the skin, or on the muscle, and that pressure is great enough to reduce the blood supply to the capillaries to that part of the body, that part of the body can receive less oxygen and eventually become ischemic.[4]

" * * *

"[I]f there is pressure on [a] particular compartment on the muscle, and the muscle is not receiving enough blood supply and it starts to swell, or the pressure within that * * * compartment changes, that change may reduce blood supply to the compartment. * * * [I]f you have enough pressure for enough time, you can reduce blood supply enough that the tissues can become injured or even begin to die and the mus-

cle can * * * die, [that is] become necrotic."

In this case, Dr. Johnson's theory of causation was based on well-established and scientifically valid principles of physiology. Manifestly, as a board-certified anesthesiologist, he was "not a charlatan or a purveyor of junk science." *Gallucci,* 709 A.2d at 1064. Indeed, even the trial justice agreed that these medical principles were not novel. In response to plaintiff's suggestion that the court take judicial notice of the aforementioned principles, the trial justice responded: "I agree with you * * * to that extent it's not novel. However, how the injury [occurred], and what could have been done to have prevented the injury * * * is on the side of being novel."

Even Dr. Towne's testimony confirmed that the principles upon which Dr. Johnson based his proposed testimony were medically sound. Doctor Towne admitted that when the blood supply to a particular muscle area or compartment was insufficient, damage to the tissues in that area will begin to occur. If the condition causing a diminished blood supply continues for an extended period, the affected muscle tissue is deprived of oxygen and nutrients and it can begin to wither. Doctor Towne also testified that external pressure applied to the skin can cause a compartment syndrome. Indeed, Dr. Towne himself stated that he had not ruled out external pressure as the cause of plaintiff's injuries, which he said occurred, to the best of his medical opinion, during the surgery itself. Nurse Paolino confirmed that she had been trained on the principle that if anything were to come into contact with a patient's so-called non-dependent areas (the areas not in contact with any other

4. The term "ischemic" was defined by the doctor to mean a "[l]ack of oxygen to the tissues."

surface or object) during the surgery—such as Owens's arm—that contact could impair blood flow, lead to the death of the affected muscle tissue, and cause a compartment syndrome.[5] Additionally, she testified that this was the reason she took care to pad and position the patient at the beginning of the operation.

Given that Dr. Johnson's proposed testimony concerning causation was not based on a novel or technically complex scientific principle, and given that defendants did not seriously dispute these basic principles of causation, we conclude that the trial justice misapplied the *DiPetrillo* test for reliability when he ruled that Dr. Johnson's opinions were not scientifically valid because they did not enjoy independent medical corroboration in the record.

### B. Dr. Johnson's Assessment of the Standard of Care

Doctor Johnson was prepared to testify that the applicable standard of care required the OR team to ensure that the patient maintained adequate perfusion or flow of his blood supply to all parts of his body during the surgery and to prevent any inappropriate external or focal pressure from being applied to the patient's body during the surgery that could diminish the blood supply. He testified at the Rule 104 hearing, that it was important to maintain this standard of care throughout the operation. He stated that, in his opinion, focal pressure applied to Owens's arm during the surgery caused his left-arm injury. Although he was unable to say with specificity what type of focal pressure had

caused the injury, he suggested that inadvertent movement of the arm during the surgery could have caused it to shift, and to come into contact with an object, which then exerted focal pressure on the arm.[6] One way, he opined, to prevent deviation from this standard of care during a prolonged operation would be to feel periodically underneath the surgical drapes to ensure that the patient's arm was positioned correctly throughout the procedure. Concerning Owens's sciatic nerve and left-buttock injuries, Dr. Johnson testified that the failure to discuss with the surgeon removal of the hip roll under the patient's left hip resulted in the reduction of the proper blood flow to that area and caused the injury to the plaintiff's sciatic nerve and left buttock.

### C. Sufficient Qualifications to Testify Regarding the Standard of Care

This Court frequently has held that an expert who has substantial credentials in the same or a closely related field as that of the defendant may testify to the standard of care required of a particular professional defendant. See *Flanagan v. Wesselhoeft*, 712 A.2d 365, 367–68 (R.I. 1998); *Gallucci*, 709 A.2d at 1065; *Sheeley v. Memorial Hospital*, 710 A.2d 161, 166 (R.I.1998).

Thus, in *Flanagan*, 712 A.2d at 369, this Court reversed a Superior Court justice's decision to exclude expert medical testimony. The defendants challenged the admission of testimony of the plaintiffs' expert

---

5. Doctor Johnson testified that "dependent" areas of the body were those areas that are in contact with pressure on the operating table due to gravity. So-called "non-dependent" areas of the body are those areas that do not need to come into contact with the operating table. Here, Owens's arms were "non-dependent" areas.

6. Doctor Johnson stated that "operations are dynamic situations. Many things are going on for long periods of time. Bodies can shift. Things can move. It's the responsibility of everybody in the operating room, particularly the anesthesia team, to be vigilant and check periodically to be sure that nothing has changed."

on the grounds that the expert, an out-of-state physician, could not testify to the standard of care for a surgeon in Rhode Island. *Id.* at 367–68. The Court stated that the expert's "board certifications and * * * extensive knowledge, skill, and experience in pediatric surgery should have presumptively permitted his deposition testimony in the form of both fact and opinion to be admitted at trial." *Id.* at 369. Again, in *Sheeley,* 710 A.2d at 166, this Court held that "[a]ny doctor with knowledge of or familiarity with the procedure, acquired through experience, observation, association, or education, is competent to testify concerning the requisite standard of care and whether the care in any given case deviated from that standard."

Here, Dr. Johnson possessed the requisite credentials, experience, and skills to allow him to testify about the standard of care owed to plaintiff, whether defendants breached that standard of care, and whether any breach caused plaintiff's injuries. Doctor Johnson was a board-certified anesthesiologist. He had degrees in medicine, biomedical science, and medical technology. He completed both a surgical internship and an anesthesia residency, including a fellowship in cardiac anesthesia, high-risk obstetrical anesthesia, and critical care. He had held the position of Director of Anesthesia at several hospitals and Associate Professor of Anesthesia at both the University of Texas Southwest and the Harvard Service of Brigham & Women's Hospital. Indeed, Dr. Johnson was so well qualified that the parties stipulated to his qualifications to testify as an expert on anesthesiology as it related to padding and positioning in an operating room. But instead of having "presumptively permitted" his opinion testimony to be admitted at trial, as *Flanagan,* 712 A.2d at 369 required, and instead of adjudging him "competent to testify concerning the

requisite standard of care and whether the care in any given case deviated from that standard," as *Sheeley,* 710 A.2d at 166 required, the trial justice ultimately barred him from testifying. In doing so, we hold, the trial justice abused his discretion.

### D. Defendants' Own Testimony Supported Dr. Johnson's Opinion About the Standard of Care

Moreover, defendants essentially agreed with the standard of care as Dr. Johnson was prepared to articulate it. Nurse Paolino testified that the devices used to pad and position Owens before the surgery began had to be applied properly to avoid undue pressure at the outset of the surgery. Most importantly, she conceded that these devices had to be maintained in place throughout the surgery to ensure proper blood flow to the padded areas of the patient's body. Doctor Towne testified that various devices—including a gel pad and the sled used on plaintiff's arm—were inserted to protect the patient from anything in the operating room that might come into contact with the patient during the operation and thereby exert pressure, potentially causing injury. He also testified that if he saw a padding or positioning device acutely out of position during surgery, he would intervene with the surgeon and correct the problem. With respect to the hip roll used on plaintiff, both Nurse Paolino and Dr. Towne admitted that the standard of care required them to be "aware" of the placement of the hip roll during the surgery—although, in an apparent contradiction, neither would admit to any reason that they were required to be cognizant of the device during the operation.

### E. The Trial Justice Misunderstood Dr. Johnson's Testimony About the Standard of Care

The defendants contend that Dr. Johnson's proffered testimony about the stan-

dard of care did not meet the standards set forth in Rule 702 or in *DiPetrillo*. The defendants cite specifically to how Dr. Johnson opined that the standard of care may, in some circumstances, include moving parts of the patient's body that come into contact with surfaces when a surgical procedure takes an unexpectedly long period to complete. Doctor Johnson, defendants argue, could not state with specificity at what time during the surgery this movement should occur. Additionally, defendants argue, the doctor's opinion on the standard of care did not meet any of the four criteria outlined in *DiPetrillo* for admitting expert testimony.[7]

### (1) The Trial Justice Must Evaluate Reasoning, Not Conclusions of the Expert

 The trial justice erred when he evaluated the conclusions Dr. Johnson reached, rather than the validity of the methods Dr. Johnson used to reach those conclusions and his qualifications to do so. As previously noted, Dr. Johnson was more than qualified to testify about the applicable standard of care. Additionally, as this Court noted in *DiPetrillo*, a trial justice should assess whether the reasoning used in forming an expert conclusion was sound, not whether the conclusions drawn from that reasoning were proper. *DiPetrillo*, 729 A.2d at 689–90. *See, e.g., Ambrosini*, 101 F.3d at 140 (the admissibility inquiry focuses not on the expert's conclusions, but on whether the methodologies and reasoning used to reach the expert's conclusions were scientifically valid); *Arnold v. Dow Chemical Co.*, 32 F.Supp.2d

584, 589–90 (E.D.N.Y.1999) (despite reservations about the conclusions of the expert, the problems associated with the proposed testimony were properly to be resolved by the jury after cross-examination).

Here, the standard of care about which Dr. Johnson was prepared to testify was that the OR team should make sure that nothing exerted pressure on the patient's body that would cut off the blood flow to plaintiff's muscle tissues during the surgery. One *conclusion* Dr. Johnson reached about the standard of care was that the members of the OR team should comply with this standard by checking non-dependent areas of the body throughout the procedure for shifts in positioning and by discussing with the surgeon the possibility of removing the hip roll that the OR team had placed under Owens's left buttock. In assessing the availability of peer studies to support this conclusion, the trial justice considered—not whether Dr. Johnson's reasoning was sound in arriving at these conclusions—but rather whether his conclusions themselves were valid.

 The proper inquiry concerning Dr. Johnson's testimony should have focused on whether he reached his conclusions using a scientifically valid method. Here, Dr. Johnson concluded that compliance with the standard of care required the OR team to check the patient's arm and hip roll during this unexpectedly prolonged surgery and that the cause of the patient's injuries was focal pressure applied to these areas during the surgery. In reaching his conclusions, Dr. Johnson described the process by which he assessed Owens's

---

7. Doctor Johnson could point to no peer studies, publications, or any written policies of the hospitals in which he worked that required movement of a patient during unusually prolonged surgeries. He could point to no studies, publications, or other scientific evidence that would specifically indicate when and

how frequently a patient should be moved during surgery. Indeed, defendants insist that Dr. Johnson's conclusions cannot be tested on human beings and that there was no evidence that his theories were generally accepted by other anesthesiologists and surgeons.

case. He testified that he reviewed it in the same way he would approach a case as a member of a quality-assurance and risk-management committee for a hospital.[8] He perused the patient's anesthesia records and medical records to determine the cause or etiology of the patient's injuries. He also reviewed depositions of the witnesses as they became available. In reaching his conclusions, Dr. Johnson scrutinized published medical literature and studies on the subject. Finally, he applied his knowledge and experience in the field of anesthesia to reach conclusions about plaintiff's injuries, their cause, and what the OR team should have done to avoid such injuries. In our opinion, Dr. Johnson's methodology complied with the requirements set forth in *DiPetrillo* and the trial justice abused his discretion in concluding otherwise.

## (2) The Trial Justice Misconstrued the Substance of Dr. Johnson's Testimony

 To the extent that the trial justice based his decision to exclude the testimony of Dr. Johnson on the premise that there are no "studies which demonstrate that movement [of a patient's body during surgery] will diminish a profusion [sic] injury," he misconceived the substance of the doctor's proposed testimony. The proposition that the OR team should consider moving a patient during a substantially prolonged surgery did not relate to Dr. Johnson's testimony about what the standard of care required the OR team to do to prevent permanent injuries of the type that this plaintiff suffered. Doctor Johnson testified that moving a patient would tend to improve circulation to dependent areas of his body that were in contact with the operating table. This was not the case, however, with the injuries to other areas, including plaintiff's injured arm and left buttock, because Dr. Johnson was prepared to testify that focal pressure—not the lack of patient movement—caused these injuries.[9] The lack of studies and literature to support Dr. Johnson's conclusion that one way to prevent injuries to dependent areas of the patient's body was to move the patient did not pertain to issues surrounding the standard of care owed to this patient to prevent the injuries to other areas of his body caused by focal pressure.[10] Therefore, the lack of studies

8. Doctor Johnson served on such committees for several hospitals.

9. Concerning the injury to Owens's arm, Dr. Johnson testified the standard of care required that the anesthesia team feel "under the drapes and * * * check * * * [if an object] is putting a lot of pressure on the limb, then you would want to change that." He testified that the injury to Owens's arm was a "focal pressure injury to the upper arm." Likewise, concerning the injury to Owens's sciatic nerve and buttocks, Dr. Johnson did not opine that the standard of care required that Owens be moved to prevent that injury, but only that the hip roll—the source of focal pressure on the patient—be removed. Specifically, when asked about the hip roll, Dr. Johnson testified "any time an object is placed under a patient that can apply focal

pressure to the patient, that can present harm to the patient."

10. During cross-examination by defense counsel on the basis for his opinion that a patient must be moved during surgery to prevent injury, Dr. Johnson testified:

"There are two separate issues that are being intertwined here. One is the concept of moving a patient to improve circulation to the dependent area that is in contact with pressure to the table because of gravity. The other is in checking the patient to make sure there is not external pressure being applied from somewhere else. * * * [Here] the compartment syndrome was not because the patient was not moved. * * * This patient had a compartment syndrome because of an external focal force. If you are asking about movement of the arms to

to support Dr. Johnson's conclusions about the need to consider movement of a patient during prolonged surgery should not have proved fatal to admitting his testimony about preventing focal-pressure injuries to the affected areas of the patient's body.

### F. The Plaintiff Attempted to Introduce Peer Publications to Support Dr. Johnson's Testimony

One factor for the trial justice to assess in determining the validity of an expert's proffered testimony is whether the substance of that testimony has been published in peer-reviewed journals or other publications. *DiPetrillo*, 729 A.2d at 689 (citing *Daubert*, 509 U.S. at 593–94). The plaintiff presented the trial justice with two written texts and an article published in a peer-reviewed journal to support Dr. Johnson's proposed opinions.[11] Although these sources may not be the last word on the applicable standard of care or the specific cause of the injuries in this case, they demonstrated support for Dr. Johnson's opinions from other experts in the field of anesthesiology. As such, they should have been considered by the trial justice in his admissibility ruling.

### G. The Plaintiff Attempted to Introduce Animal Studies to Support a Portion of Dr. Johnson's Theory

One factor the trial justice can assess in determining the validity of an expert's proffered testimony is whether the subject of that testimony can be or has been tested. *DiPetrillo*, 729 A.2d at 689 (citing *Daubert*, 509 U.S. at 593). Doctor Johnson based his opinion partially on several studies performed with canine subjects. In the specific study cited, Dr. Johnson testified that tourniquets were placed around the limbs of dogs, shutting off all blood supply. He testified that he used these studies "to see how long or how much ischemia [reduction of blood supply] was necessary to cause complete muscle damage." Doctor Johnson explained that the medical profession has used canine models extensively in anesthesia studies because their muscle tissue functions in ways that are more similar to humans than many other animals. He explained that the reason there were no such studies on human subjects was that he could conceive of no ethical way to conduct such studies.

The defendants cite *General Electric Co. v. Joiner*, 522 U.S. 136, 144–45, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), for the proposition that such studies on animals cannot

---

minimize pressure injuries from gravity, that's completely different than checking the arm to be sure there isn't something coming in contact with the external upper part of the arm that can cause a compartment syndrome."
Because Dr. Johnson testified that the sciatic nerve and buttock injury were the result of focal pressure from the hip roll, presumably the same analysis applies to that injury.

11. During the preliminary hearing, plaintiff presented to the trial justice a medical text, Dr. John Martin & Dr. Warner, *Positioning in Anesthesia and Surgery* (2d ed.1989), in which the authors opined that the anesthesiologist should be involved in the "selection, establishment and evaluation" of the effects of patient positioning during surgery in an effort to

protect the patient. Also, another medical treatise, Barash et al., *The Clinical Anesthesia* (3d ed.1996) stated that the potential exists for pressure from an arm strap to compress the arm and result in injury to the nerve caused by diminished blood flow. And lastly, an article entitled, *Compartment Syndromes: Concepts and Perspectives for the Anesthesiologist*, written by Dr. John Martin and published in Anesthesia and Analgesia Journal, 1992, confirmed that focal pressure can cause compartment syndrome and discussed the basic principles of physiology that lead to a compartment syndrome. These proffered treatises and medical literature were consistent with Dr. Johnson's proposed testimony on these subjects.

be used to support Dr. Johnson's theories. In *Joiner*, 522 U.S. at 144–45, the Supreme Court held that an animal study relied on by plaintiff's experts to establish a causal link between exposure to polychlorinated biphenyls (PCBs) and the plaintiff's cancer was so factually dissimilar to the case at bar that the trial justice properly rejected the experts' reliance on it. The Court, however, did not rule out the possibility that animal studies could be a valid basis for an expert's opinion about the effect that certain experiences can have on human beings. *Id.* Rather, it stated that "whether animal studies can ever be a proper foundation for an expert's opinion was not the issue. The issue was whether *these* experts' opinions were sufficiently supported by the animal studies on which they purported to rely." *Id.*

Unlike the study described in *Joiner*, the dog studies alluded to by Dr. Johnson did support his opinion on causation and his conclusions about when the patient's blood supply was restricted. The plaintiff's experts in *Joiner* used the mouse study to support their conclusion that PCBs caused plaintiff's cancer, whereas in this case Dr. Johnson used the animal study only to provide support for his conclusion about when Owens's blood flow was restricted during the operation. Unlike the cancer developed by the mice in *Joiner*, the focal-pressure mechanism used to cut off blood supply to the limbs of the dogs used in the experiment produced the same type of injuries that plaintiff suffered here, different only in degree. Likewise, although the OR team did not use a tourniquet to restrict the blood flow to Owens during surgery, there is evidence in the record indicating that the OR team deliberately reduced Owens's blood pressure during the surgery to control his bleeding. Also, the OR team used devices during the surgery that applied pressure to Owens's skin. The dog studies cited by Dr. John-

son to support his estimate regarding when Owens's injuries occurred are sufficiently similar to the facts of this case that the trial justice should have allowed them to be used as support for the expert's conclusions about when the injuries occurred. In addition, Dr. Towne testified that, in his opinion, whatever caused Owens's injuries occurred some time during the surgery.

 In deciding whether to admit proffered expert testimony, the trial justice must take care not to interfere with the jury's role as the trier of fact. *See DiPetrillo*, 729 A.2d at 687 (citing Stephen Breyer, *The Interdependence of Science and Law*, 82 Judicature 24, 26 (1998)). In this case, however, the trial justice ultimately granted defendants' motion to exclude Dr. Johnson's opinions for the same reasons he denied it after the preliminary hearing. In the first instance, he chose to allow the expert to testify and to permit the jury to determine whether such testimony was worthy of belief. Upon reconsideration, however, the justice applied an overly rigid standard for admitting the various individual components of Dr. Johnson's testimony, ultimately ruling that his proffered testimony was unworthy of belief because it appeared to constitute a novel theory that lacked independent corroboration in the medical community. But under *Flanagan, Sheeley*, and our other cases on expert medical witnesses, Dr. Johnson was legally competent to testify to the applicable standard of care and to the OR team's alleged deviation therefrom; and his opinions would have assisted the jury in reaching a conclusion in this case. When the evidence presented to support the expert's proposed opinions is sufficient to allow a reasonable juror to conclude that his or her methods are grounded in valid science, then cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof are the appropriate means of attacking the reliability of this evidence. *See Daubert,* 509 U.S. at 596.

Here, the trial justice, we hold, should have allowed Dr. Johnson to testify, thereby permitting the jury to weigh the credibility of his opinions. We are of the opinion that based upon the expert doctor's unquestionable credentials, qualifications, and special knowledge, skill, experience, and education in the field of anesthesia, he was qualified to render his opinions in this case. Moreover, given these qualifications, the doctor's opinions about what caused plaintiff's injuries would have assisted the jury in considering the evidence and in determining whether defendants' conduct in this case caused plaintiff to suffer the injuries in question. Thereafter, the jury could have decided how much weight—if any—to give these opinions in light of the dearth of peer-reviewed studies and published protocols to corroborate his specific theories of causation. Thus, we conclude, the trial justice abused his discretion in determining that Dr. Johnson was not qualified to render his opinions because his theory of negligence was not one shared by the individual defendants, and because plaintiff failed to introduce any evidence that would corroborate the scientific validity of Dr. Johnson's causation conclusions.

### III

**Precluding the Use of Deposition Testimony at Trial Obtained from the Opposing Parties' Experts**

■ The plaintiff also argues that the trial justice erred in barring him from using the deposition testimony of defendants' experts in his case-in-chief.[12] He contends that the trial justice based his decision "primarily on a 'feeling' that it simply would not be fair to permit this practice." The plaintiff alleges that the deposition testimony that he intended to present was from expert witnesses who were unavailable. Therefore, he argued, pursuant to Rule 32(a)(3)(B) of the Superior Court Rules of Civil Procedure, he should have been permitted to use the deposition testimony of the defendants' expert witnesses.

The defendants assert that the trial justice properly precluded plaintiff from using the deposition testimony of their expert witnesses during his case-in-chief. The hospital argued that it did not intend to call the experts in question as witnesses in the case. Therefore, if the trial justice had allowed plaintiff to call such experts as his own witnesses, he would have impermissibly shifted the burden of proof to the defendants. The hospital also argued that plaintiff's attempt to introduce the discovery deposition of one of the hospital's expert witnesses during plaintiff's case-in-chief was not a permissible use of this evidence under Rule 32, which addresses the uses of depositions in court proceedings. The defendants further argue that, in plaintiff's interrogatory answers, plaintiff failed to designate any of defendants' experts as his own trial experts. For this reason alone, they urge us to hold that the trial justice was correct in precluding plaintiff from introducing the deposition testimony of any defense expert as part of his case-in-chief.

---

12. It should be noted that the rules of evidence, including the Rule 32 limitation on the use of depositions, do not apply to hearings held pursuant to Rule 104 of the Rhode Island Rules of Evidence and to other *in limine* proceedings. Therefore, the trial justice should have allowed plaintiff to use any deposition testimony given by defense experts for the sole purpose of supporting plaintiff's position that Dr. Johnson's opinions should be admitted into evidence because he based them on scientifically valid reasoning and methodology.

In excluding the deposition testimony of defendants' expert witnesses, the trial justice reasoned that it would be unfair to permit plaintiff to present one or more of defendants' expert witnesses as his own experts during his case-in-chief. The trial justice also stated that, based upon this Court's holdings in *L'Etoile v. Director of Public Works*, 89 R.I. 394, 153 A.2d 173 (1959) and *Ondis v. Pion*, 497 A.2d 13 (R.I.1985), "a party may not obtain and may not introduce at trial an opinion of a witness—an expert witness if that party has not retained, in fact, that expert witness and compensated that expert witness for the opinion that is being sought to be introduced."

As has been noted previously, evidentiary rulings concerning expert testimony are committed to the trial justice's sound discretion and will not be disturbed. *ADP Marshall, Inc.*, 784 A.2d at 314. Pursuant to Rule 32(a)(3),

"[t]he deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:

(A) That the witness is dead; or

(B) That the witness is out of state, unless it appears that the absence of the witness was procured by the party offering the deposition; or

(C) That the witness is unable to attend or testify because of age, sickness, infirmity, or imprisonment; or

(D) That the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or

(E) Upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used. A deposition of a medical witness or any witness called as an expert, other than a party, which has been recorded by videotape by written stipulation of the parties or pursuant to an order of court may be used at trial for any purpose whether or not the witness is available to testify."

Although this rule clearly provides for the use of depositions in a trial, it does not specifically address the use of expert-witness depositions, which in this case the parties scheduled only by agreement because the rules do not provide for such depositions as a matter of right. Here, the reason that defendants' expert witnesses were unavailable to plaintiff was not because they lived and worked out-of-state, but because plaintiff failed to designate them as such in his answers to interrogatories and failed to engage them as testifying expert witnesses for plaintiff in this case. In addition, plaintiff was unable to compel these witnesses to testify under subpoena at trial because he was barred from doing so by the applicable case law.

 Absent extraordinary circumstances not present in this case,[13] a nonparty expert cannot be compelled to give opinion testimony against his or her will. *See Sousa v. Chaset*, 519 A.2d 1132, 1136 (R.I.1987); *Ondis*, 497 A.2d at 18. In *Sousa*, 519 A.2d at 1135, the plaintiff attempted to subpoena an expert who did not wish to testify. This Court held the trial court properly sustained defendant's objection, stating "[a]n expert who has not been engaged, but only subpoenaed, cannot be compelled to give opinion testimony against his or her will." *Id.* at 1136. In *Ondis*, 497 A.2d at 18, the plaintiff wished

---

13. Such circumstances might exist, for example, when there are no other experts available who can address the substance of the issues in the case, or when the expert in question is uniquely qualified to do so.

to subpoena a plastic surgeon who had observed the plaintiff's injuries and treatment and to elicit from the witness an expert opinion. This Court held that it is the "obligation of a party who desires expert testimony to obtain the services of a qualified person on a voluntary basis." *Id.*

Like the plaintiffs in *Sousa* and *Ondis,* Owens attempted to procure expert testimony for his case-in-chief without engaging the services of such experts on a voluntary basis. The plaintiff obtained the deposition testimony of a defendant's expert through the discovery process, not by securing it voluntarily from the witness. As such, plaintiff could not use this evidence in his case-in-chief.

■ Additionally, plaintiff did not designate the defense expert in question, Dr. Martin, as one of plaintiff's testifying experts in his answers to interrogatories on this subject. Rule 26(b)(4)(A) of the Superior Court Rules of Civil Procedure states "[a] party may * * * require any other party to identify each person whom the other party expects to call as an expert witness at trial." Although the defense decided not to call this witness at trial, that decision did not absolve plaintiff from complying with the rule requiring the pretrial identification of expert witnesses who will testify on his behalf. In addition, Rule 33(c) of the Superior Court Rules of Civil Procedure requires a party to supplement his answers to interrogatories when he receives information that makes his previous response incomplete. The purpose of Rule 33(c) is to prevent "trial by ambush" and to allow "litigants to prepare for trial free from the elements of surprise and concealment so that judgments can rest upon the merits of the case * * *." *Neri v. Nationwide Mutual Fire Insurance Co.,* 719 A.2d 1150, 1152 (R.I.1998) (quoting

*Gormley v. Vartian,* 121 R.I. 770, 775, 403 A.2d 256, 259 (1979)).

In *Neri,* 719 A.2d at 1152–53, we held that failure to notify the opposing party pursuant to Rule 26(b)(4)(A) of the identity of an expert witness—who in that case was also an opposing party—barred the expert from testifying as such at the trial. We reasoned that, although the defendants had the ability to cross-examine the witness as a party to the case, they still did not have the opportunity to do so in the witness's capacity as an expert. *Neri,* 719 A.2d at 1152. Given the importance of the proffered testimony, we held that it was improper for the trial justice to allow this witness to testify as an expert at trial. *Id.* at 1153.

Like the plaintiff in *Neri,* plaintiff here did not identify Dr. Martin as an expert who would testify on his behalf at the trial, as he was bound to do pursuant to Rule 26(b)(4)(A). Coupled with the fact that Owens failed to engage Dr. Martin as an expert to testify on his behalf, this omission was a sufficient basis to exclude Dr. Martin's testimony during plaintiff's case-in-chief.

## IV

## Denial of Plaintiff's Motion to Hold a Hearing *In Limine* to Preclude Defendants from Introducing Evidence of Informed Consent

■ Finally, plaintiff asserts that the trial justice erred in failing to hold a hearing *in limine* before denying his motion to preclude defendants from introducing evidence of his informed consent to the surgery. He cites G.L.1956 § 9–19–32 for the proposition that defendants' attempt to introduce Owens's consent form must be considered by the court as a preliminary

question of fact.[14] He argues that defendant introduced the evidence of Owens's informed consent to the surgery as an affirmative defense. He insists that before introducing any evidence of informed consent, defendants had to establish, by way of expert testimony, that plaintiff's injuries occurred despite the fact that defendants were not negligent. The defendants counter that the trial justice's decision relative to the admissibility of the consent form that plaintiff signed was proper and within his discretion, and that he did not err in failing to convene a hearing *in limine* before ruling on this issue. We agree with defendants on this issue.

Contrary to plaintiff's assertion, defendants did not attempt to introduce the consent form as an affirmative defense to a claim that defendants failed to obtain plaintiff's informed consent to the operation. Rather, defendants sought to introduce Owens's consent form to show that he assumed the risk of suffering certain injuries as a result of undergoing this type of surgery and that he suffered the injuries in question not because of any malpractice but because such injuries occurred as part of the normal risks of undergoing this type of surgery. The cause of Owens's sciatic nerve and buttock injury was a highly disputed factual issue in this case. The plaintiff sought to present evidence that the cause of the injury was a hip roll placed under his left buttock during the surgery. The defendants sought to introduce evidence that the cause of this injury was a hematoma, which was an inherent risk of this type of surgery, and that plaintiff expressly assumed this risk, as evidenced by the consent form. Therefore, defendants' offering of the consent form into evidence was not to rebut an alleged lack "of informed consent or reasonable disclosure of all known material risks,"— the type of case addressed by the statute—but to show that the injury in question could and did occur not because of malpractice, as Owens contended, but because this was one of the assumed risks of this type of surgery even in the absence of any malpractice.

Moreover, it was the plaintiff's burden to prove that his injuries occurred as a result of the defendants' negligence; it was not the defendants' burden to prove that the injuries occurred in the absence of any negligence.[15] Thus, because § 9–19–32 did not apply in this situation, we hold that the trial justice did not abuse his discretion in failing to conduct an *in limine* hearing before permitting the defendants to introduce into evidence the informed-consent form.

---

**14.** General Laws 1956 § 9–19–32 provides, in pertinent part:

"In actions against physicians * * * for malpractice in providing treatment to patients, issues of informed consent or reasonable disclosure of all known material risks shall be initially considered by the court as preliminary questions of fact. Such issues shall be submitted to the jury by the court only in the event that it finds, after weighing the evidence and considering the credibility of the witnesses, that reasonable minds might fairly come to different conclusions in respect to such issues * * *."

**15.** We take no position, however, on the ultimate admissibility of the informed-consent form. The affirmative defense of assumption of the risk requires the defendants to "show that the party who is alleged to have assumed the risk [had] * * * actual knowledge of the precise risk before electing to encounter it." *Habib v. Empire Productions, Inc.*, 739 A.2d 662, 665 (R.I.1999) (per curiam). *See also Hennessey v. Pyne*, 694 A.2d 691, 699 (R.I. 1997). It is therefore incumbent upon the defendants to affirmatively prove, through expert testimony or other relevant evidence, that the precise injuries sustained by the plaintiff fell within the risks set forth on the informed-consent form and were not caused by malpractice.

## Conclusion

Although the trial justice did not err in concluding that, in the context of the trial, he was entitled to revisit his earlier determination regarding the admissibility of Dr. Johnson's testimony, we hold that the trial justice abused his discretion in excluding Dr. Johnson's testimony for several reasons. First, the trial justice erred in barring Dr. Johnson's testimony on the issue of causation because Dr. Johnson did not base his proposed testimony on a novel or technically complex scientific principle and defendants did not seriously dispute the basic principles of causation in this situation. Second, Dr. Johnson possessed the requisite credentials, experience, and skills to allow him to testify about the standard of care and defendants essentially agreed with the standard of care as Dr. Johnson was prepared to articulate it. Third, the trial justice erred when he evaluated the conclusions Dr. Johnson reached, rather than the validity of the methods Dr. Johnson used to reach those conclusions. Fourth, he misconceived the substance of the doctor's proposed testimony. Fifth, the trial justice should have considered the animal studies cited by Dr. Johnson to support his opinion about when Owens's injuries occurred. Thus, we hold, the trial justice abused his discretion in determining that Dr. Johnson was not qualified to render his opinions because his theory of negligence was not one shared by the individual defendants, and because plaintiff failed to introduce any evidence that would corroborate the scientific validity of Dr. Johnson's causation conclusions.

In addition, we affirm the ruling of the trial justice barring plaintiff from introducing expert witness testimony for his case-in-chief without engaging the services of such experts on a voluntary basis. Lastly, the trial justice did not abuse his discretion in failing to conduct an *in limine* hearing before permitting the defendants to introduce into evidence the informed-consent form that Owens signed before undergoing this surgery.

For these reasons, we reverse in part and affirm in part the challenged rulings of the trial justice, vacate the judgment for the defendants, and remand the papers in this case for a new trial consistent with this opinion.